**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/26/2018

Cirila A. Laureano,

Plaintiff,

-against-

Commissioner of Social Security,

Defendant.

1:17-cv-01347 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Cirila Laureano ("Laureano" or "Plaintiff") brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security, denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[1] (Compl., ECF No. 2.) Presently before the Court is the Commissioner's motion, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings, (Notice of Mot., ECF No. 14 & Mem. L., ECF No. 15), Plaintiff's statement in opposition to Commissioner's motion (Opp., ECF No. 18), and the Commissioner's reply memorandum of law in support of judgment on the pleadings. (Reply Mem. L., ECF No. 19.)

For the reasons set forth below, the Commissioner's motion is DENIED and the case is remanded for further proceedings.

---

[1] On January 18, 2017, the Social Security Administration ("SSA") promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 60 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Laureano's claims were filed before this date, to the extent that the Social Security regulations are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

**BACKGROUND**

I.      **Procedural Background**

Laureano filed for SSI and DIB benefits on April 3, 2012, alleging a disability onset date of February 29, 2012 in both applications. (Administrative R. ("R."), ECF No. 11-3, at 332, 334.) Following an initial denial of benefits on July 6, 2012 (R. 112), Laureano had a hearing before Administrative Law Judge ("ALJ") Hilton R. Miller on October 3, 2013. (R. 70-81.) ALJ Miller issued a decision on January 31, 2014 denying Laureano's benefits applications. (R. 91-101.) On July 15, 2015, the Appeals Council granted Laureano's request for review and remanded the case to the ALJ, finding that the ALJ did not provide sufficient rationale for his residual functional capacity (RFC) determination.[2] (R. 107-09.) ALJ Miller held a second hearing on October 6, 2015. (R. 70-81, 28-66.) ALJ Miller denied Laureano's benefits application for the second time on November 27, 2015. (R. 23.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied review on January 27, 2017. (R. 1.) This action followed.

II.     **Non-Medical Evidence And Laureano's Testimony**

Born on May 10, 1957, Laureano was 54 at the onset date and 58 years old at the time of the 2015 hearing. (R. 332.) Laureano lives with her daughter in the New York metropolitan area. (R. 34, 36.) She has a third grade education from the Dominican Republic and speaks very little English. (R. 31.) Laureano most recently worked as a home health aide prior to claiming disability and, prior to that, was employed as a factory hand packer. (R. 384.)

Laureano testified that she suffered from severe multi-level lumbar and cervical disc

---

[2] At the time, the ALJ determined that Laureano was capable of performing light work with certain limitations, including some mental limitations. (*See* R. 95-99.)

disorders, herniation, multiple cervical and lumbar disc bulges, severe depression, fibromyalgia and high cholesterol. (R. 32.) Laureano further testified that she is unable to work because she "cannot do any heavy lifting[,]" "can hardly walk[,]" and needs a brace to sleep. (R. 33.) Laureano testified that she could lift 2-3 pounds; occasionally use public transportation alone for medical appointments; wash small items like her coffee cup as needed; style her own hair; and put on clothing, unless experiencing severe pain in which case her daughter provided help. (R. 33-36, 39.)

### III.  Medical Evidence Before The ALJ

#### A.  January–May 2012 Treatment Records

In January 2012, Laureano was seen by Dr. Martha Valdivia at Groupo Medico Dominicano for right shoulder pain and bilateral knee pain. (R. 565.) At the time, Laureano was assessed with fibromyalgia and joint pain and was taking the pain medication Savella. (*Id.*) Upon examination, Dr. Valdivia found decreased range of motion in Laureano's shoulders and decreased range of motion below the knees, but no instability. (*Id.*) Dr. Valdivia prescribed additional medication for joint pain and advised Laureano to follow up in three months. (R. 566.) Dr. Valdivia also referred Laureano to neurology for follow-up regarding her fibromyalgia. (*Id.*)

On February 28, 2012, Laureano underwent an MRI of her lumbar and cervical spine.[3] (R. 472.) The lumbar spine MRI showed "L4-5 right paracentral herniation with impingement upon

---

[3] "A normal human vertebral column consists of thirty-three vertebrae labeled according to their position and region (in descending order, cervical ('C1' through 'C7'), thoracic ('T1' through 'T12'), lumbar ('L1' through 'L5'), sacral ('S1' through 'S5') and coccygeal ('Co1' through 'Co4')). The fifth lumbar vertebra, for example, is labeled 'L5.' The space between the fifth lumbar and first sacral vertebrae, for example, is labeled 'L5–S1.' " *Friedman v. Astrue*, No. 07-CV-03651 (NRB), 2008 WL 3861211, at * 2 n. 4 (S.D.N.Y. Aug. 19, 2008) (citing *Dorland's Illustrated Medical Dictionary* 2079 (31st ed.2007)).

both the traversing and exiting L4-5 nerve roots, and disc bulges at L3-4 and L2-3 with thecal sac impingement at both levels." (*Id.*) The cervical spine showed "straightening of cervical curvature; very small posterior midline herniation at C3-C4; small posterior herniation at C4-C5; retrolisthesis[4] and posterior bulge at C5-C6; and a posterior herniation at C6-C7." (*Id.*)

On April 13, 2012, Laureano saw Dr. Valdivia for a follow-up appointment. (R. 567-68.) Laureano reported that she had had an MRI showing that two discs were out of place and that her back pain was severe. (R. 567.) Dr. Valdivia indicated that Laureano had decreased range of motion of the lumbar spine and positive straight leg raising.[5] (*Id.*) Dr. Valdivia continued Laureano's medications for fibromyalgia and referred her to psychiatry for depression and anxiety due to her difficulty dealing with her pain issues and lack of improvement. (R. 568.)

On April 18, 2012 Dr. Kyla Blatt conducted a neurological consultation and referred Laureano to the pain service due to intractable back pain. (R. 429.) Several days later, on April 21, 2018, Dr. Valdivia referred Laureano to physical therapy for her lower back pain, noting that it was recommended by "Neurology." (R. 432-33) On April 23, 2012, Dr. Armando Ruiz conducted a physiatry[6] consultation. (R. 446-48.) Upon examination, Dr. Ruiz found that Laureano had

---

[4] Retrolisthesis, or retrospondylolisthesis, refers to posterior displacement of one vertebral body on the subajacent body. *Dorland's Illustrated Medical Dictionary* 1636 (32d ed. 2012).

[5] Straight leg raising "is a means of diagnosing nerve root compression, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg. If the patient feels pain in the back at certain angles (a 'positive test'), the pain may indicate herniation." *Moore v. Astrue*, No. 07-CV-05207 (NGG), 2009 WL 2581718, at *2 (E.D.N.Y. Aug. 21, 2009) (internal citation omitted).

[6] "A physiatrist is a physician who specializes in physical medicine and rehabilitation." *Guilbe v. Colvin*, No. 13-CV-06725 (JPO), 2015 WL 1499473, at *5 (S.D.N.Y. Mar. 31, 2015).

normal range of motion in her upper and lower extremities but antalgic gait[7] and pain in the right hip when flexing. (R. 446.) Dr. Ruiz also found that Laureano's cervical spine flexion was within normal limits, but noted tenderness of the paraspinal lumbar sacral areas. (*Id.*) Dr. Ruiz assessed that Laureano could walk one block, stand five to ten minutes and sit for thirty minutes. (*Id.*)

The same day, Laureano underwent a physical therapy evaluation at Uptown Care Management.[8] (R. 441-44.) Laureano indicated that she had difficulty bending; lifting objects from the floor; standing for more than ten minutes; sitting for more than thirty minutes and moderate difficulty negotiating stairs. (R. 441.) Laureano continued to receive physical therapy two to three times per week for the next five weeks. (R. 430, 435, 440, 449-54.)

On May 21, 2012, Dr. Ruiz again evaluated Laureano, noting that she had experienced little relief of her lower back pain. (R. 436-39.) Dr. Ruiz's finding regarding Laureano's range of motion and muscle spasms remained the same, though he noted pain in her right hip, as well as a positive straight leg raise on her right side. (R. 437.) Dr. Ruiz again assessed that Laureano could walk one block, stand five to ten minutes and sit for 30 minutes, and noted that she should not do any lifting. (R. 437, 439.) The same day, Dr. Ruiz wrote a letter stating that Laureano was still under his care and should "avoid heavy lifting or twisting[.]" (R. 430.)

On May 31, 2012, Laureano was seen by Dr. Angela Stroe, M.D., for a pain management consultation. (R. 434.) Laureano's chief complaint was lower extremity pain. (*Id.*) Dr. Stroe noted some tenderness, but found that Laureano had a full range of motion. (*Id.*) Dr. Stroe also assessed

---

[7] "An antalgic gait is one in which the stance phase of walking is shortened on one side due to pain on weight bearing." *Rodriguez v. Astrue*, No. 02-CV-01488 (BSJ) (FM), 2009 WL 1619637, at * 6 n.23 (S.D.N.Y. May 15, 2009) (internal citation omitted).

[8] Uptown Care Management, Inc. does business as East Tremont Medical Center, New York Neuro & Rehab Center and Jerome Family Health Center. (*See* R. 429.)

lumbar disc displacement and lumbar radiculopathy.[9] (*Id.*) Dr. Stroe noted that Laureano was receiving physical therapy and prescribed additional medication. (*Id.*)

**B.**     **May 2012 Consultative Examinations**

**1.**     **Dr. Marilee Mescon, M.D. – Internal Medicine Consultative Examination**

Dr. Marilee Mescon performed an internal medicine consultative examination of Laureano on May 17, 2012. (R. 422-26.) Laureano reported that she had experienced pain in her back since 2005 that began while lifting heavy objects at work and had experienced headaches, lasting for one to two hours, for two months. (R. 422.) In terms of her daily activities, Laureano reported that she could shower, bathe and dress herself, but her daughter did the cooking, cleaning, laundry and shopping. (R. 423.) She also reported spending her time watching TV, listening to the radio and reading. (*Id.*)

Upon examination, Dr. Mescon found that Laureano could walk on heels and toes without difficulty, but could only squat halfway down. (*Id.*) Dr. Mescon noted that Laureano's cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. (R. 437.) Dr. Mescon also noted active straight leg raising in a supine position of 0 to 30 degrees on the right and 0 to 60 degrees on the left; and active straight leg raising in a seated position was 0 to 90 degrees on both the left and right. (*Id.*) Neurologically, Dr. Mescon found diminished sensory perception over the entire right leg, 4/5 motor strength in the right upper and lower leg and 5/5 motor strength in the left upper and lower leg. (R. 424-25.) Dr. Mescon

---

[9] Radiculopathy is a "disease of the nerve roots." *Dorland's Illustrated Medical Dictionary* 1571 (32d ed. 2012). Lumbar radiculopathy is a "disease of the lumbar nerve roots, such as from a disc herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias[,] an abnormal touch sensation. *Id.* at 1383, 1571.

sent Laureano for an x-ray of the lumbosacral spine, which showed degenerative spondylosis[10] at L2-L3 through L4-L5, but no compression fracture. (R. 425-26.) Radiologist Dr. Lawrence Liebman, who interpreted the x-ray, concluded there were "degenerative changes[.]" (R. 426.) Dr. Mescon diagnosed Laureano with headaches and back pain with arthritis, but opined that "there are no limitations in the claimant's ability to sit, stand, climb, push, pull, or carry heavy objects at this time." (R. 425.)

### 2. Dr. Arlene Broska, Ph. D. – Psychiatric Consultative Examination

Also on May 17, 2012, psychologist Arlene Broska performed a psychiatric consultative examination of Laureano. (R. 418-21.) Laureano reported that she felt down every day, did not take care of her appearance and did not like to go outside. (R. 418.)  She explained that she used to be very active and was distressed by the fact that she could no longer be active due to her health problems. (*Id.*) Laureano stated that she had some thoughts of dying when she first became ill in February 2012, but after taking Cymbalta she had been feeling better, though she reported having anxiety. (*Id.*)

On examination, Dr. Broska found that Laureano was cooperative and had an adequate manner of relating and social skills; a well-groomed appearance; adequate speech and language skills; coherent thought processes; appropriate affect; dysthymic mood; intact attention and concentration; memory skills within normal limits; and average cognitive functioning. (R. 419-20.) Vocationally, Dr. Broska assessed that Laureano could follow and understand simple

---

[10] "Spondylosis is a broad term that simply refers to some type of degeneration in the spine. Most often, the term spondylosis is used to describe osteoarthritis of the spine, but it is also commonly used to describe any manner of spinal degeneration." *Van Allen v. Colvin*, No. 15-CV-00174 (DJS), 2016 WL 5660377, at *2 (D. Conn. Sept. 29, 2016) (citation omitted).

directions and instructions; perform simple tasks and some complex tasks independently; and maintain attention and concentration, though she may not relate adequately with others or appropriately deal with stress. (R. 420.) Dr. Broska noted that these results were consistent with psychiatric problems, but did not appear to be significant enough to interfere with Laureano's ability to function on a daily basis. (*Id.*) Dr. Broska diagnosed Laureano with depressive disorder and recommended psychiatric intervention and individual psychological therapy. (R. 421.)

### C. August 2012 Through July 2015 Treatment Records

In August 2012, Laureano saw Dr. Valdivia for another follow-up appointment, complaining of right leg pain. (R. 569.) Laureano's treatment plan included taking Ibuprofen, Methocarbamol, Cymbalta and Gabapentin (the latter for fibromyalgia). (R. 469.) Dr. Valdivia again referred her to "Pain Medicine" and physical therapy due to chronic pain. (R. 570.)

In January 2013, Laureano saw Dr. Valdivia again, stating that she had experienced only minimal improvement in her pain and complained of debilitating pain in all joints, especially her shoulders, elbows and spine. (R. 571.) Laureano also complained of swelling in her hands, which she reported caused her to drop things constantly. (*Id.*) Dr. Valdivia noted that Laureano had undergone an MRI of her spine the previous week and that "Neurology" had recommended a rheumatology evaluation. (R. 571.)

During a follow-up visit in May 2013, Laureano complained of left knee pain with swelling and difficulty climbing stairs. (R. 573.) Dr. Valdivia prescribed pain medication for Laureano's knee and referred her to pain medicine and neurosurgery for intractable lower back pain with disc herniation and impingement. (R. 574.) In June 2013, Psychiatrist Mencia Gomez began treating Laureano for "Major Depressive Disorder, Recurrent." (R. 470-71.) In September 2013, Dr.

Valdivia noted that an MRI ordered by Physiatry showed a femur fracture with marrow edema and referred Laureano to Orthopedic Surgery. (R. 576, 595.) On September 25, 2013, Dr. Blatt wrote a letter in support of Laureano' disability application, stating that Laureano was "fully medically disabled." (R. 472.) Dr. Blatt referred to Laureano's MRI results and also noted that Laureano had high cholesterol, fibromyalgia and depression. (*Id.*)

In January 2014, Laureano again saw Dr. Valdivia for a follow-up visit. (R. 577-78.) Dr. Valdivia noted that Laureano never went to rheumatology because it was too far from her home. (R. 577.) Dr. Valdivia further noted that Laureano went to her orthopedic appointment and was told there was nothing wrong with her knee. (*Id.*) Dr. Valdivia wrote that it was "apparent [the orthopedist] never saw the MRI[,]" but also noted that Laureano had been told to return to orthopedics in one month and did not do so. (*Id.*) In September 2014 Dr. Valdivia noted that Laureano's gait was antalgic, but Laureano reported "feel[ing] well" and had "no complaints[.]" (R. 580-82.) Laureano also reported that she did not feel depressed in the two weeks leading up to her appointment. (*Id.*)

During a June 11, 2014 follow-up examination, Laureano reported disabling pain that radiated down her legs. (R. 501.) At the time, she was not taking any medications. (*Id.*) Dr. Blatt rated Laureano's motor strength as a 5/5 in the upper and lower extremities and found that her gait was mildly antalgic. (*Id.*) Laureano indicated that her mood was down, but that she would restart Cymbalta and Dr. Blatt asked her to follow up in six weeks. (*Id.*)

On June 20, 2014, Laureano was seen by Dr. Zia Jaghory, M.D., at New York Neuro & Rehab Center. (R. 499-500.) Laureano complained of neck pain and lower back pain and Dr. Jaghory ordered a series of cervical epidural steroid injections, which Laureano received in July

2014. (R. 500, 481-83.) Laureano returned to see Dr. Jaghory following the injections, but reported still being in pain. (R. 497-98.) Dr. Jaghory recommended that Laureano continue therapy. (R. 498.)

On July 17, 2014, Dr. Stroe saw Laureano at East Tremont Medical Center. (R. 494-96.) Dr. Stroe found that Laureano had a normal gait and normal range of motion in the upper and lower extremities; normal cervical spine range of motion; below normal range of motion in the lumbar spine; muscle spasms; normal upper and lower deep tendon reflexes; and that her straight leg raising tests were normal. (R. 494.) Dr. Stroe assessed that Laureano could walk for ten minutes at a time. (R. 495.) Dr. Stroe recommended a home exercise program and prescribed two additional medications for pain. (*Id.*) Laureano continued to attend physical therapy in August 2014. (R. 492-93.)

In September 2014, Laureano saw Dr. Blatt for another follow-up appointment. (R. 490-91.) Laureano reported problems with memory and sleep, as well as continuing back pain. (R. 490.) Laureano declined additional steroid injections as she was unhappy with the relief achieved, but expressed interest in trying a different pain medication. (R. 490-91.)

In October 2014, Laureano received MRIs on her lumbar spine, cervical spine and brain. (R. 473-77.) Upon review of the lumbar spine MRI, Dr. Eric Sax, M.D., found "annular disc bulging of a mild degree at L2-L3, L3-L4, and mildly at L4-L5." (R. 473.) Dr. Sax also found a small disc protusion at L3-L4 and L2-L3; a moderate protrusion at L4-L5; moderate foramen[11] narrowing at

---

[11] "Spinal nerves pass through an opening in the spinal column known as the foramen. The process of disc degeneration or bulging causes the foramen to become narrower." *Ostrom v. Comm'r of Soc. Sec.*, No. 14-CV-00268 (MAD), 2015 WL 1735097, at *11 (N.D.N.Y. Apr. 16, 2015) (citing http://www.spinaldisorders.com/neural-foraminal-narrowing.htm).

L4-L5; minimal foramen narrowing at L2-L3 and L3-L4; and no central canal stenosis.[12] (*Id.*) For the cervical spine, Dr. Michael Paley, M.D. found cervical spine straightening and mild disc space narrowing. (R. 476.) Laureano also underwent a multiplanar, multisequence brain MRI without intravenous contrast. (R. 475.) Based on that test, Dr. Paley determined that Laureano had scattered sinus disease. (*Id.*)

Dr. Stroe saw Laureano for a follow-up appointment on October 23, 2014. (R. 524-25.) Laureano reported that her neck and back pain had returned and that she was more depressed and had difficulty getting out of bed. (R. 524.) Dr. Stroe's objective findings remained that same as in July 2014, including normal range of motion in the lower and upper extremities, decreased range of motion in the lumbar spine and muscle spasms in the lumbar and cervical spine. (*Id.*) Dr. Stroe also assessed Laureano as "independent" in all activities of daily living. (R. 524-25.)

Between November 2014 and January 2015, Laureano continued with physical therapy, and followed-up with Dr. Stroe on two more occasions, with minimal changes in assessment. (R. 510-23, 558.) In February 2015, Dr. Stroe noted that Laureano's pain had worsened in her left leg and advised her to go to the emergency room if the pain worsened or she developed swelling. (R. 553, 555.) Laureano followed-up with Dr. Stroe in March 2015 and agreed to a plan to continue physical therapy. (R. 550-52.)

When Dr. Valdivia saw Laureano again in January 2015, she noted "no complaints[,]" but also noted that Laureano reported feeling depressed and had been experiencing an exacerbation

---

[12] "Spinal stenosis is a 'narrowing of the vertebral canal, nerve root canals, or inter-vertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equine and include pain, paresthesias, and neurogenic claudication.'" *Moore*, 2009 WL 2581718, at *4 n.21 (quoting *Dorland's Illustrated Medical Dictionary* 1795 (31st ed. 2007)).

of her back pain on and off for the past three days. (R. 583-85.) In May 2015, Laureano again followed-up with Dr. Stroe, reporting worsening lower back pain and pain in her left leg. (R. 547-49.) Laureano had just returned from the Dominican Republic and requested a new prescription for physical therapy and refills of her medications. (R. 547.) Dr. Stroe's objective assessment remained unchanged. (R. 547-48.) Laureano's physical therapist also noted no changes or improvement. (R. 544-46.)

In June 2015, Dr. Stroe noted that Laureano was "feeling better with [physical therapy]" and that she had a pending appointment for epidural injections. (R. 537.) That month, Laureano was also seen for a neurology consultation and another pain management consultation. (R. 507-09.) A physician assistant continued Laureano's physical therapy and medications and referred her for another series of epidural spinal injections, which she received over the following month. (R. 478-80, 509, 586.) Laureano also continued with physical therapy (R. 529-33.)

On June 17, 2015, Laureano underwent nerve conduction velocity and electromyogram (NCV/EMG) testing[13] to assess nerve damage. (R. 559-62.) The study revealed evidence of a left tibial motor neuropathy and a left L4-L5 radiculopathy. (R. 559.) During a July 16, 2015 assessment, Laureano reported that a second series of pain management injections administered in the previous few weeks had provided some relief. (R. 478-80, 586.) Further, Dr. Valdivia conducted a clinical depression screening and Laureano reported feel down or depressed "more than half the days." (R. 586.)

---

[13] A NCV test "is often used to distinguish between a nerve disorder and a muscle disorder." *Rivera v. Berryhill*, No. 16-CV-05021 (PKC), 2018 WL 388942, at *2 (E.D.N.Y. Jan. 12, 2018) (internal citation omitted). EMG is "a procedure used to assess muscles and nerve cells that control them." *Id.*

IV.    **Expert Testimony At 2015 Hearing**

A.    **Dr. John Axline – Medical Expert Testimony**

Dr. John W. Axline, a board-certified orthopedic surgeon, testified as a medical expert at Laureano's hearing. (R. 488.) (R. 37-38.) Dr. Axline testified that Laureano did not meet or equal a physical listing. (R. 40.) He came to this conclusion for a number of reasons: (1) the degenerative disc disease of the cervical and lumbar spine were mild in degree and not associated with any neurologic loss; (2) fibromyalgia was not supported by the record; and (3) there was evidence of exaggerated symptoms or malingering. (R. 40-41.)

Dr. Axline first opined on Laureano's degenerative disc disease after consulting MRI and physical examination evidence.[14] (R. 40.) In examining the record, Dr. Axline discounted evidence of lumbar (L4/5) and cervical (C5/6) steroid injections as he did not believe that this procedure was either an effective treatment plan or confirmation of a diagnosis. (R. 43, 478-83.) Similarly, regarding Laureano's EMG/NCV report, Dr. Axline found that while the evidence showed 1+ positive waves and fibrillation of the left L4/5 paraspinal muscles suggesting neuropathy or radiculopathy, there were no physical findings supporting a listing. (R. 52, 559-62.)

Finally, Dr. Axline concluded that Laureano either was exaggerating her symptoms or malingering because her Waddell's sign, which tested Laureano's leg raising ability, was different in degree in the supine, or laying, and sitting positions. (R. 31, 424.) To this point, Dr. Axline also referenced Laureano's report that she does not take care of her appearance, yet she was noted

---

[14] Dr. Axline did not review the vast majority of Laureano's records from Groupo Medico Dominicano, which were provided in response to a subpoena from the ALJ following the October 6, 2015 hearing. (*See* R. 325-330).

by the Department of Social Security as being heavily made up with a history of plastic surgery. (R. 41, 355, 419, 565.)

During Laureano's hearing, Dr. Axline testified that Laureano's degenerative disease in the cervical and lumber spine were severe, as classified by "Social Security," but her impairment was minimal. (R. 42.) Dr. Axline opined that Laureano could perform the functional range of medium work, which includes lifting and/or carrying up to 50 pounds occasionally and 25 pounds frequently and standing and/or walking for up to six hours per work day. (R. 42-43.) Upon further questioning, Dr. Axline declared that there was no objective evidence showing that Laureano would be unable to perform even heavy exertional work. (R. 43.)

**B.     Dr. Sharon Kahn – Psychological Expert Testimony**

Dr. Sharon Kahn testified as a psychological expert at Laureano's hearing. (R. 53-57.) Prior to the hearing, Dr. Kahn reviewed Laureano's available medical records, but did not personally examine her. (R. 54.) Dr. Khan opined that Laureano's psychological impairments were not severe and did not meet or equal a listing. (R. 55.)

**C.     Jackie Wilson, MS, CRC – Vocational Expert Testimony**

Jackie Wilson, MS, CRC, also testified at the hearing as a vocational expert. (R. 57-64, 414.) Ms. Wilson testified that Laureano's past work as a home health aide and hand packager fell into the medium exertional range. (R. 58-59.) Classified as such, Wilson declared that an individual with Laureano's characteristics and the RFC to perform medium work could still perform the same job duties. (R. 61.) The ALJ presented four more hypotheticals to Wilson with varying additional restrictions. (R. 61-64.) For example, Wilson testified that an individual with Laureano's characteristics and the RFC to perform medium work, but who was limited to

occasional contact with others could still perform the work of a hand packager, as well as a meat clerk, counter supply worker or machine feeder. (R. 62-67.) On the other hand, Ms. Wilson testified that there are no adequate jobs for someone with the RFC to perform only sedentary exertional work with no fine or gross manipulation, no reaching, a sit-stand option at will, and no public contact and only superficial contact with coworkers. (R. 64.)

## V.     ALJ Miller's 2015 Decision

On November 27 2015, the ALJ issued a decision, following the five-step process required by the regulations. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also infra* Discussion Section I(B).

ALJ Miller determined that Laureano did not have a disability within the meaning of the Act. (R. 14-23.) At step one, the ALJ found that Laureano had not engaged in substantial gainful activity since the alleged onset date of her disability. At step two, the ALJ determined that Laureano's degenerative disc disease of the cervical and lumbar spine were severe impairments as defined in 20 C.F.R. §§ 404.1520(c) and 416.920(c). (R. 16-18.) However, the ALJ found that her fibromyalgia and headaches were nonsevere. (R. 17.) The ALJ noted that the record indicated a diagnosis of fibromyalgia but no supporting physical examination or symptoms. (*Id.*) Similarly, the ALJ found that while the record contained complaints of headaches there was no supplementary medical evidence, such as testing, which would support a severe impairment categorization. (*Id.*) Further, the ALJ ruled that Laureano's depression and anxiety, considered singly and together, were at most a minimal limitation and thus "nonsevere" for social security purposes. (*Id.*)

At step three of the sequential analysis, the ALJ found that Laureano did not have an impairment or combination of impairments that met or equaled the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 18.) In making this decision, the ALJ noted that no treating source "mentioned findings or rendered an opinion that the claimant's impairments, singly or in combination, medically equaled the criteria or any listed impairment." (*Id.*) As for Laureano's RFC, the ALJ found that Laureano could perform at the range of medium work, as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), with minimal limitations. (R. 18-22) Specifically, the ALJ determined that Laureano could lift and/or carry up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk with normal breaks for a total of 6 hours in an 8-hour work day; sit with normal breaks for a total of 6 hours in an 8-hour workday; occasionally climb ramps and stairs, but not ladders, ropes or scaffolds; frequently balance, kneel, crouch or squat; and occasionally crawl. (R. 18.)

At step four of the sequential analysis, relying on the vocational expert testimony, the ALJ found that Laureano was capable of performing her past work as a home health aide or hand packager. (*Id.*) Accordingly, the ALJ concluded that Laureano was not disabled. (R. 15.)

**DISCUSSION**

I.    **Legal Standards**

    A.    **Standard Of Review**

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a

rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-4518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995). The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" *E.g.*, *Duvergel v. Apfel*, No. 99-CV-04614 (AJP), 2000 WL 328593, at *7 (S.D.N.Y. Mar. 29, 2000); *see also, e.g.*, *Douglass v. Astrue*, 496 Fed. App'x 154, 156 (2d Cir. 2012); *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *amended in part on other grounds*, 416 F. 3d 101 (2d Cir. 2005).

Further, *pro se* litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotation marks and citation omitted); *see also Alvarez v. Barnhart*, No. 03-CV-8471 (RWS), 2005 WL 78591, at *1

(S.D.N.Y. Jan. 12, 2005) (articulating liberal standard in reviewing denial of disability benefits for *pro se* plaintiff).

**B.      Determination Of Disability**

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 432(d)(1)(A), 1382c(a)(3)(A); *see, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 23 (2003); *Barnhart v. Walton*, 535 U.S. 212, 214 (2002); *Impala v. Astrue*, 477 Fed. App'x 856, 857 (2d Cir. 2012).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see, e.g.*, *Barnhart v. Thomas*, 540 U.S. at 23; *Barnhart v. Walton*, 535 U.S. at 218.

In determining whether an individual is disabled for benefits purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *see*, *e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

*Barnhart v. Thomas*, 540 U.S. at 24-25 (internal citations and footnotes omitted); *see also Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her residual functional capacity, age, education and past relevant work experience. *Id.* at 51.

19

## C.     The Treating Physician Rule

Under the treating physician rule, the ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

"Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ should consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion." *Gonzalez v. Comm'r of Soc. Sec.*, No. 16-CV-08445 (KMK) (PED), 2017 WL 7310391, at *11–12 (S.D.N.Y. Dec. 21, 2017), *report and recommendation adopted*, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018) (citing 20 C.F.R. § 416.927(c)(2)-(6)) (additional citation omitted).

While the ALJ need not expressly address each factor, the ALJ must provide "good reasons" for the weight accorded to the treating physician's opinion. *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion"); *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them.").

Despite the general rule, "[t]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). This is because "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Burgess*, 537 F.3d at 128.  "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Id.* For example, a consulting physician's opinions or report may be given limited weight because "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Santiago v. Berryhill*, No. 17-CV-05149 (LGS), 2018 WL 4387554, at * (S.D.N.Y. Sept. 14, 2018) (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)).

### D.    The ALJ's Duty To  Develop The Record

Because social security proceedings are "essentially non-adversarial," the ALJ has an affirmative duty to develop the record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal citation omitted); *see also Rosa*, 168 F.3d at 79 ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history."). An ALJ "must ensure that "[t]he record as a whole [is] complete and detailed enough to allow the ALJ to determine claimant's residual functional capacity." *Casino-Ortiz v. Astrue*, 06-CV-00155 (DAB) (JCF), 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R.

§ 404.1513(e)(1)-(3)). This duty exists even if the claimant is represented by counsel.[15] *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

"Whether the ALJ has satisfied this duty to develop the record is a threshold question." *Ogirri v. Berryhill*, No. 16-CV-09143 (JLC), 2018 WL 1115221, at *7 (S.D.N.Y. Feb. 28, 2018). "Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), 'the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record.' *Id.* (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-05782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.").

The duty to develop the record is even more important when the information concerns a claimant's treating source. *See Ulloa*, 2015 WL 110079, at *11 (citation omitted). This is because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20 C.F.R. § 416.927(c)(2)).

As part of the duty to develop the record duty, "the ALJ is required to make 'every reasonable effort' to obtain a claimant's treating physician's medical reports." *Barrie on behalf*

---

[15] Although Laureano was represented by counsel in the proceedings before the ALJ, she is not represented by counsel in this action.

*of F.T. v. Berrhill*, No. 16-CV-05150 (CS) (JCM), 2017 WL 2560013, at *10 (S.D.N.Y. June 12, 2017) (quoting *Oliveras ex rel. Gonzalez v. Astrue*, No. 07-CV-02841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report and recommendation adopted*, 2008 WL 2540816 (S.D.N.Y. June 25, 2008)); *see also* 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1).. Thus, the ALJ's duty to develop the record is "inextricably linked" to the treating physician rule. *See Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

## II.     Review Of The ALJ's Decision

### A.     The ALJ Failed To Adequately Develop The Record

As a threshold matter, the Court finds that the ALJ failed to adequately develop the record with respect to both Laureano's mental impairments and opinion evidence from treating sources regarding her ability to perform work-related functions.

### 1.     Lack Of Psychiatric Treatment Records

"The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment." *See Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-06704 (JPO), 2015 WL 321832, at *22 (S.D.N.Y. Jan. 23, 2015) (citing *Camilo v. Comm'r of the Soc. Sec. Admin.*, 11-CV-01345 (DAB) (MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013) ("[I]t is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment.")). Here, the ALJ was aware that Laureano had received psychiatric treatment during the relevant time period, but the record before the ALJ did not include any of Laureano's psychiatric treatment records. This constituted an obvious gap in the administrative record that the ALJ was required to address. *See Peterson v. Barnhart*, 219 F.

Supp. 2d 491, 494-95 (S.D.N.Y. 2002) (noting "sparse notes, incomplete record[s] of medical visits, and brief, conclusory assessments" constitute gaps in the record (citing *Rosa*, 168 F.3d at 79)); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 345 (E.D.N.Y. 2010) ("Given the complete absence from the file of contemporaneous medical evidence from [plaintiff's treating physicians,] there are clearly very significant gaps and deficiencies in the record.") (internal citation omitted).

During the October 6, 2015 hearing, Laureano's counsel stated that Laureano had been seeing a psychiatrist since 2012 and that he had been trying to get copies of the records. (R. 55.) He subsequently asked the ALJ to issue a subpoena to obtain those records. (R. 65.) The day following the hearing, the ALJ subpoenaed Laureano's treatment records from Groupo Medico Dominicano. (R. 564.) Approximately one week later, the office produced records, which primarily consisted of treatment records from Dr. Valdivia, but did not contain any treatment notes from Dr. Taveras or Dr. Gomez. (*See* R. 565-622.) The ALJ did not take any additional steps to obtain Laureano's psychiatric treatment records, but nonetheless concluded that her mental impairments were nonsevere. (R. 21.) Moreover, with respect to Laureano's mental RFC, the ALJ relied on this lack of evidence, concluding that the record did not support any vocational limitations attributable to depression or anxiety. (R. 21.)

The Court finds that the ALJ did not make "every reasonable effort" to obtain the relevant records. *See Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 451 (S.D.N.Y. 2004) ("Merely issuing a subpoena by mail is not the legal equivalent of making every reasonable effort to obtain the medical reports."). Nor was this a case where the ALJ could "choose not to seek additional evidence or clarification from a medical source" based on "experience that the source either

cannot or will not provide the necessary evidence." 20 C.F.R. §§ 404.1520b(c), 416.920b(c). Groupo Medico Dominicano promptly responded to the ALJ's subpoena. Thus, the ALJ should have taken additional steps to obtain the appropriate records. *See Pitcher v. Barnhart*, No. 06-CV-01395 (LEK) (VEB), 2009 WL 890671, at *14 (N.D.N.Y. Mar. 30, 2009) (when treating source previously submitted records, ALJ could not claim that the source would not respond to request). The ALJ's failure to do so constitutes legal error warranting remand. *See Sanchez v. Colvin*, No. 13-CV-06303 (PAE), 2015 WL 736102, at *6-7 (S.D.N.Y. Feb. 20, 2015) (remanding because ALJ failed to obtain treating psychiatrist's opinion and noting that, for claimant suffering from bipolar disorder, "[a] treating psychiatrist's insights, which may capture what a one-time visit to a consulting psychologist cannot, would be obviously valuable"); *see also La Torre v. Colvin*, No. 14-CV-03615 (AJP), 2015 WL 321881, at *13 (S.D.N.Y. Jan. 26, 2015) (collecting cases).

The Commissioner argues that the ALJ's finding that Laureano did not have a severe mental impairment is supported by substantial evidence. (Mem. L. at 19-20.) The Commissioner points to Laureano's "limited treatment for psychological problems[,] as well as the opinions of Dr. Broska and Dr. Kahn. (Mem. L. at 19-20.) However, the Court cannot determine whether the ALJ's decision was supported by substantial evidence if the determination was based on an incomplete record.[16] *See Corporan*, 2015 WL 321832, at *21 (declining to consider whether RFC

---

[16] In any event, the Court is not persuaded by the Commissioner's argument. First, the Court notes that in his January 31, 2014 decision the ALJ determined that Laureano's depression was a severe impairment, despite considering similar evidence, including the opinion of Dr. Broska. (*See* R. 93-95.) It appears that the only new evidence the ALJ considered was the opinion of Dr. Kahn. However, Dr. Kahn did not personally examine Laureano and was able to review only the limited treatment records available at the time of the hearing. (*See* R. 54.) Moreover, the ALJ gave "great weight" to Dr. Kahn's opinion that Laureano's mental impairments were nonsevere based on the fact that it was "supported by the evidence in the record with nothing controverting it." (R. 21.) That is unsurprising given the lack of psychological treatment notes and should only have reinforced the need for further development of the record.

determination based on substantial evidence when record was incomplete).

### B. Lack Of Evidence Regarding Ability To Perform Work-Related Functions

The Court also finds that the ALJ failed to adequately develop the record with regard to Laureano's ability to perform work-related functions. The only examining medical source to provide an RFC assessment was consultative examiner Dr. Mescon, who opined that there were no limitations on Laureano's ability to sit, stand, climb, push, pull, or carry heavy objects. (R. 425.) However, that examination occurred in May 2012, well before the date of the ALJ's RFC determination. *See Batista v. Barnhart,* 326 F.Supp.2d 345, 353 (E.D.N.Y. 2004) (ALJ failed to adequately develop the record by seeking updated RFC assessments from claimant's treating sources). Moreover, there are limited records from any of Laureano's treating physicians regarding her functional limitations. Thus, the Court finds that the lack of an updated medical source opinion containing a function-by-function assessment rendered the record incomplete. *See Alessi v. Colvin*, No. 14-CV-7220 (WFK), 2015 WL 8481883, at *4 (E.D.N.Y. Dec. 9, 2015) ("[G]iven the gaps in the record and the absence of a thorough and sufficient medical assessment of Plaintiff's ability to sit, stand, walk, or lift from any physician who had seen the lumbar and cervical MRIs, the ALJ committed legal error by deciding Plaintiff could perform past relevant work without seeking to fill this gap."); *cf. Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (ALJ not required to seek medical source statement by treating physician where ALJ possessed treatment notes of treating physicians regarding functional limitations and most of the consultative examiner's RFC assessment).

For these reasons, the Court finds that the ALJ was obligated to develop the record and obtain RFC assessments from one or more of Plaintiff's treating physicians. *See McMahon v.*

*Colvin*, No. 16-CV-01997 (VSB) (DF), 2017 WL 8948743, at *35 (S.D.N.Y. Aug. 18, 2017), *report and recommendation adopted*, No. 16-CV-01997 (VSB) (DCF), 2018 WL 1989560 (S.D.N.Y. Apr. 25, 2018) ("The fact that the ALJ made his disability determination without first obtaining treating source statements regarding Plaintiff's functional impairments warrants remand.").

### B.  The ALJ Failed To Comply With The Treating Physician Rule

In addition to failing to adequately develop the record, the Court finds that the ALJ erred by failing to comply with the treating physician rule. Plaintiff contends, among other things, that the ALJ erred in giving more weight to the non-treating and non-examining medical advisor's conclusions than to reports written by her treating doctors. (Opp. at 1.) The Court agrees. In particular, the ALJ erred by failing to give good reasons for discounting the opinions of Dr. Blatt, Dr. Taveras and Dr. Gomez and failing to discuss the opinions of other treating physicians, including Dr. Ruiz.

### 1.  Evidence Regarding Laureano's Physical RFC

The only opinion of one of Laureano's many treating physicians that the ALJ considered in his decision was a September 2013 letter from Dr. Blatt that referred to Laureano's MRI results and concluded that Laureano was fully medically disabled. (R. 21, R. 472.) The ALJ gave this opinion "limited weight" because it did not "set forth a function-by-function assessment that would be helpful in formulating a [RFC] assessment." The ALJ also determined that the treating records were inconsistent with this opinion because they showed, "for the most part, examinations with normal gait, full strength in the muscoskeletal system and no neurological defects." (R. 22.) The Commissioner does not specifically address the treating physician rule, but asserts that the ALJ appropriately assigned little weight to Dr. Blatt's opinion based on

inconsistent records from Uptown Health Management, as well as the fact that the opinion that Laureano was fully disabled was not entitled to special significance because that is an issue reserved for the Commissioner. (*Id.* at 19.)

The Court finds that the ALJ's analysis is insufficient to comply with the treating physician rule. First, the lack of a function-by-function assessment alone is not a "good reason" for rejecting the opinion of a treating physician. *See Stango v. Colvin*, No. 14-CV-01007 (CSH), 2016 WL 3369612, at *11 (S.D.N.Y. June 17, 2016) (treating physician's opinion could not be "totally disregarded" for failure to perform function-by-function assessment). This is particularly true because the ALJ never sought such an assessment from Dr. Blatt, or any of Laureano's other treating physicians. *See id.* ("if the ALJ viewed the function-by-function assessment as necessary, her role was to further develop the record"). Similarly, if the ALJ perceived inconsistencies in Dr. Blatt's report and other treatment records (which he does not specifically identify), he was required to further develop the record. *Id.* at **12-13.

As for the Commissioner's argument regarding Dr. Blatt's opinion that Laureano was fully disabled, the responsibility of determining "the ultimate issue of disability" does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited." *Ogirri*, 2018 WL 1115221, at *8 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). In any event, this too, is insufficient, without any attempt to further develop the record. *See Geronimo v. Colvin*, No. 13-CV-08263 (ALC), 2015 WL 736150, at *7 (S.D.N.Y. Feb. 20, 2015) ("Simply put, it is entirely possible that [the treating physician,] if asked, could have provided a sufficient explanation for any seeming lack of support for his ultimate

diagnosis of complete disability. A remand is necessary to afford [the treating physician] the opportunity to provide such an explanation.") (internal quotation omitted).

Moreover, in choosing to assign Dr. Blatt's opinion limited weight, the ALJ failed to address other relevant factors including the length, nature and extent of Dr. Blatt's treatment relationship with Laureano; the evidence in support of Dr. Blatt's opinion; and the fact that Dr. Blatt is a specialist. *See Burgess*, 537 F.3d at 129-30 ("Failure to provide such good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."); *see also* S*antiago*; 2018 WL 2018 WL 4387554, at *5 (ALJ's failure to address factors and provide good reasons for discounting opinion of treating physician warranted remand).

In addition, the ALJ ignored other evidence in the record from Laureano's treating physicians that supported greater limitations in her RFC. For example, he did not address Dr. Stroe's determination that Laureano could "walk for ten minutes at a time" or Dr. Ruiz's statements that Laureano could walk one block, stand five to ten minutes, and sit for thirty minutes and that she should not do any lifting or twisting. (R. 430, 437, 439, 446, 495.)

The Commissioner contends that Dr. Ruiz's opinion is not inconsistent with the ALJ's determination "to the extent that the doctor meant that plaintiff should not lift weights over fifty pounds." (Mem. L. at 18.) The Commissioner also contends that the ALJ's decision not to limit Laureano's ability to twist is supported by substantial evidence. (*Id.* at 18-19.) However, the ALJ himself did not address this evidence, and thus, the Court finds that these arguments "are impermissible *post hoc* rationalizations by the Commissioner[.]" *McAllister v. Colvin*, 205 F. Supp. 3d 314, 333 (E.D.N.Y. 2016). Nor can the Commissioner, or the ALJ, speculate as to what Dr. Ruiz intended. By failing to provide any reason for giving what amounts to no weight to Dr. Ruiz's

opinion, the ALJ failed to comply with the treating physician rule. *See Burgin v. Astrue*, 348 F. App'x 646, 648–49 (2d Cir. 2009) (ALJ erred in failing to discuss treating physician's opinion; finding ALJ's consideration must be explicit in the record).

The ALJ's error cannot be characterized as harmless, as the Court cannot say that the application of the correct legal standards by the ALJ could lead to only one conclusion. *C.f. Zabala*, 595 F.3d at 409 (2d Cir. 2010) (declining to remand even though the ALJ failed to satisfy the treating physician rule where "application of the correct legal principle could lead [only to the same] conclusion"). The opinions of Laureano's treating physicians that are available "directly conflict with the ALJ's RFC finding, and if credited, might yield a substantially different result." *Thomas v. Colvin*, 302 F. Supp. 3d 506, 511 (W.D.N.Y. 2018).[17]

The Commissioner argues that the ALJ's decision was supported by substantial evidence, including findings by Laureano's treating sources, as well as the opinions of Dr. Axline and Dr. Mescon. (*See* Mem. L. at 16-19.) However, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (quoting *Johnson*, 817 F.2d at 986).

---

[17] Further, because the Court finds that the ALJ has a duty to further develop the record, the AL's consideration of additional evidence   must consider that evidence as well. *Barrie on behalf of F.T.* 2017 WL 2560013, at *10 ("Because the ALJ's duty to develop the record dovetails with the treating physician rule, until an ALJ satisfies the threshold requirement under the duty to develop the record, the ALJ cannot even begin to discharge his duties under the treating physician rule.") (internal quotations and citation omitted).

In any event, the Court finds that the evidence relied on by the Commissioner does not "rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician[s]." *Burgess*, 537 F.3d at 128. First, the ALJ gave "significant weight" to the opinion of medical expert Dr. Axline. (R. 21.) Dr. Axline opined that Laureano's diagnosis of degenerative disc disease in the neck and lumbar spine were established, but her impairment was minimal and she could perform the full range of medium work. (R. 42.) However, Dr. Axline did not examine Laureano and did not have access to all of Laureano's treatment records, including records from Dr. Valdivia (*see* Exhibit 16F (R. 564-606)), at the time he gave his opinion. *See Stackhouse v. Colvin*, 52 F. Supp. 3d 518, 521 (W.D.N.Y. 2014) ("Because [consulting physician's] opinion was itself based upon an incomplete and insufficient record, the ALJ's decision cannot be said to rest upon substantial evidence.").

Further, Dr. Axline only reviewed the EMG/NCV report, which indicated left tibial motor neuropathy and left L4/5 radiculopathy, during the hearing itself. (R. 46-53.) Previously, Dr. Axline had stated that he "did not see any confirmation of radiculopathy or neuropathy." (R. 46.) When Laureano's attorney asked Dr. Axline during the hearing if the report's findings changed his opinion, Dr. Axline responded, "[w]ell, no, not really." (R. 51-52.) Dr. Axline took issue with the way the report was written, stating that "there's an L4 radical and an L5 radical, but no L4/5." (R. 52.) He also stated that there was no physical examination to show the electrical abnormality as associated with any physical findings. (*Id.*) However, Dr. Axline's opinion is not a sufficient basis for the ALJ to discount the conclusions of the report, particularly because the ALJ failed to consider other evidence in the record assessing radiculopathy (*see, e.g.*, R. 434) or seek clarification from any of Laureano's treating physicians. *Accord Hidalgo v. Bowen*, 822 F.2d 294,

297 (2d Cir. 1987) (a "corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis.").

The ALJ also gave "significant weight" to consultative examiner Dr. Mescon's opinion that Laureano had no limitations. (R. 22.) The ALJ found that this was "generally supported by the record" but also noted that other findings, such as 4/5 strength in the right lower extremity and MRI findings, supported limiting Laureano to a range of medium work. (R. 22.) However, this assessment occurred in May 2012 (R. 24), and therefore cannot meaningfully contradict evidence from Laureano's treating physicians as to her condition at a later date.[18] *See Acevedo v. Astrue*, No. 11 CIV. 8853 (JMF) (JLC), 2012 WL 4377323, at *16 (S.D.N.Y. Sept. 4, 2012), *report and recommendation adopted sub nom.*, 2012 WL 4376296 (S.D.N.Y. Sept. 24, 2012) (finding "troubling" the weight given to an RFC assessment nearly two years before the ALJ's decision and noting that "timeliness of evidence is also a factor that courts have cited in finding a lack of substantial evidence[.]") (collecting cases).

Moreover, neither Dr. Axline nor Dr. Mescon made specific findings regarding Laureano's ability to perform various work-related functions, including, most notably, her ability to lift. Nonetheless, the ALJ determined that Laureano is capable of performing medium work, which includes "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567, 416.967. Without medical evidence as to Laureano's ability to lift weight, the Court cannot find that the ALJ's RFC determination is

---

[18] The Court also notes that, relying on this same opinion, the ALJ previously determined that Laureano was capable of performing only light work. (*See* R. 95-99.)

supported by substantial evidence. *Accord Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396,433 (S.D.N.Y. 2010) ("The absence of medical evidence on the question of sitting capacity renders [the ALJ's] conclusion that [the Plaintiff] can sit for six hours of an eight-hour day wholly unsupported by evidence.")

### C. Evidence Regarding Laureano's Mental RFC

The ALJ also disregarded what little evidence there was in the record from Laureano's treating physicians regarding her mental impairments. In his decision, the ALJ references letters from Dr. Taveras and Dr. Gomez[19] in September 2013 that indicate that Laureano had been treated since June 2013 for major depressive disorder, recurrent and unspecified; that she was taking certain medications; and that she required ongoing psychotherapy and medication management. (R. 22; *see also* R. 470-71.) However, the ALJ determined that these letters were not medical opinions because they did not contain a function-by-function analysis or other conclusory statement and did not, on their own, establish the presence of a severe impairment. (R. 22.) As discussed above, this is not a "good reason" for rejecting the available evidence. *See Stango* 2016 WL 3369612, at *11.

At a minimum, the ALJ should have considered Dr. Taveras's and Dr. Gomez's diagnoses of Laureano and her prescribed medications. By failing to assign any weight to Plaintiff's treating psychiatrists, and by implicitly rejecting their diagnoses without providing any reasons for doing so, the ALJ committed error that requires remand. *See Fontanez v. Colvin*, No. 16-CV-01300 (PKC), 2017 WL 4334127, at *18 (E.D.N.Y. Sept. 28, 2017); *see also Calzada v. Asture*, 753 F. Supp. 2d

---

[19] The ALJ states that both letters were written by Dr. Taveras. (R. 22.) However, the first letter is signed by Dr. Mencia Gomez, another psychiatrist in the Fernando T. Taveras, MD PC. (*See* R. 470.)

250, 275 (S.D.N.Y. 2010) (ALJ erred by failing to further develop and address a clear gap in the record regarding plaintiff's mental status or even to acknowledge the relevant evidence of plaintiff's prescribed medications).

Further, while the ALJ cited to treatment records from Dr. Valdivia noting that Laureano had "an appropriate mood and affect," he ignored other assessments in the same set of records showing that Laureano suffered from depression with anxiety. (*See, e.g.*, R. 567-68, 586-87.). Thus, it appears that the ALJ implicitly rejected Dr. Valdivia's opinion as to Laureano's condition, except to the extent it supported his determination. This, too, violates the treating physician rule. Indeed, such an inconsistent use of the medical evidence undermines any argument that the treating physician's opinion was so unreliable that it should not have been assigned controlling weight. *Gallishaw v. Comm'r of Soc. Sec.*, 296 F. Supp. 3d 484, 497 (E.D.N.Y. 2017) (internal citation omitted).

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for judgment on the pleadings be DENIED and remands this matter to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. On remand, the ALJ is directed to develop the record by, *inter alia*, obtaining RFC assessments from medical sources, including Plaintiff's treating physicians, and provide good reasons for the weight he assigns to those opinions. The ALJ should also reassess Plaintiff's credibility in light of the additional medical evidence.

DATED:    September 26, 2018
          New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**